IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | | |
|---|---|---|
| SINGING RIVER ELECTRIC § | | |
| POWER ASSOCIATION § | | PLAINTIFF |
| § | | |
| v. § | Civil Action No. 1:10cv486-LG-RHW | |
| § | | |
| BELLSOUTH § | | |
| TELECOMMUNICATIONS, INC. § | | DEFENDANT |

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANT'S MOTION TO DISMISS**

**BEFORE THE COURT** is the Motion to Dismiss [4] filed by Bellsouth Telecommunications, Inc. Singing River Electric Power Association has filed a response in opposition to the Motion, and Bellsouth has replied. Upon reviewing the submissions of the parties and the applicable law, the Court finds that the Motion to Dismiss should be granted as to the unjust enrichment claim, the punitive damages claim, the attorneys' fees claim, and portions of the specific performance and declaratory judgment claims. The Motion is denied in all other respects.

FACTS

Singing River and Bellsouth entered into a General Agreement for Joint Use Poles that permits either party to lease space on utility poles owned by the other party. (Ex. A to Compl.) The Agreement required the parties to pay an annual rental fee per utility pole. (*Id.* at Art. XI (A)). The parties agreed to tabulate the number of joint use poles prior to November 15th of each year. (*Id.* at Art. XI (D)). As a result, the parties provided certifications to each other every year that detailed the number of joint use poles in use. The Agreement also provided:

> At intervals not exceeding five (5) years, an actual physical inventory of Joint Use Poles shall be made by representatives of the Parties. If any difference in the number of Joint Use Poles is found between the actual physical inventory and the previous inventory adjusted by any applications approved or attachments removed since the last inventory, the differential will be presumed to have occurred equally over the time since the last inventory and prorated equally over that time. That differential shall be billed at the appropriate rate for each of the prorated years . . . .

(*Id.* at Art. XI (F)). The term "joint use pole" is defined in the Agreement as "a pole upon which space is provided under this Agreement for the Attachments of both Parties, whether such space is actually occupied by Attachments or reserved therefore upon specific request and consistent with applicable law." (*Id.* at Art. II (I)). The term "attachment" means "any wire, cable, strand, material, pedestal, or apparatus attached to a joint use pole, excluding ground wires, now or hereafter used by either Party in the construction, operation or maintenance of its plant. . . ." (*Id.* at Art. II (D)).

Singing River claims that, in 1999, the parties conducted a physical inventory of the poles and found that Bellsouth was utilizing 50,060 Singing River poles. (Compl. at 4). It also contends that the parties were contractually obligated to conduct another inventory in 2004, but Bellsouth would not agree to do so until August of 2005. (Id. at 7). The inventory was delayed by Hurricane Katrina, and it was not completed until 2008. (*Id.*) The inventory revealed that Bellsouth was utilizing only 45,010 poles. (*Id.*)

The parties do not dispute that Bellsouth may be owed a refund as a result of the 2008 inventory, but they disagree over the amount of the refund. (Ex. C to Compl.) Bellsouth argues that the differential between the 1999 inventory and 2008 inventory

should be pro rated equally among the intervening years, while Singing River argues that most of the differential resulted after Hurricane Katrina. It appears that Bellsouth stopped paying rental fees to Singing River after the dispute arose. (*See* Ex. C, D to Compl.) In 2009 and 2010, Singing River sent letters to Bellsouth, declaring Bellsouth to be in default. (*Id.*) Bellsouth made a partial payment to Singing River in November of 2009. (Ex. D to Compl.) In July of 2010, Singing River terminated the Agreement. (Ex. E to Compl.) However, Singing River claims that portions of the Agreement survive termination, including clauses pertaining to billing and the attachments that existed prior to termination. (Compl. at 9).

Singing River filed this lawsuit against Bellsouth, seeking a declaratory judgment interpreting the contract language in a manner favorable to Singing River. It has also filed a claim for unjust enrichment and specific performance. It seeks monetary damages, attorneys' fees, and punitive damages.

## DISCUSSION

In order to avoid dismissal pursuant to Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact) . . . ." *Twombly*, 550 U.S. at 555. The court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d at 205.

However, the court "may not rely upon conclusional allegations or legal conclusions disguised as factual allegations." *Lovick v. Ritemoney Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004). If a court considers matters outside the pleadings, the motion to dismiss must be treated as a motion for summary judgment, but "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's Complaint and are central to her claim." *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). In the present case, the parties discuss the General Agreement for Joint Use Poles, which was attached to the complaint as an exhibit and is central to Singing River's claims. Therefore, the Agreement is part of the pleadings, and it is not necessary for the Court to convert the Motion to a motion for summary judgment.

**I. Singing River's Declaratory Judgment Claim:**

Singing River asks the Court to make the following declarations:

1. That a Joint Use Pole is a pole upon which space is provided under this Agreement for the Attachments of both Parties, whether such space is actually occupied by Attachments or reserved therefore upon specific request and consistent with applicable law;
2. That a pole becomes a Joint Use Pole once the other Party attaches;
3. That a pole remains a Joint Use Pole until written notification of the removal by the attaching Party is given to the Owner of the pole;
4. That a pole remains a Joint Use Pole unless and until the attaching Party provides written notice, that said space is no longer being reserved for future use;
5. Agreeable to [Bellsouth's] Form 6407, the number of [Singing River's] MS Joint Use poles on which [Bellsouth] has Attachments is as follows: 1999 -50,650; 2000 - 50,605; 2001 - 51,572; 2002 - 52,086; 2003 - 52,086; 2004 - 52,336; 2005 - 52,336; 2006 - 52,336; 2007 - 52,336; 2008 - 45,010.
6. To define the word "presumed" as used in Article XI(F), and apply Black's Law Dictionary to and to define the word "presumption as: "A rebuttable presumption that gives rise to the existence of a presumed

> fact, unless rebutted, and once rebutted, the force of the presumption is entirely dissipated."
> 7. That for the calendar and billable year 2008, [Bellsouth] owes [Singing River] the sum of $1,039,902.75, with applicable interest and/or penalties as provided in the Contract from and after April 1, 2009;
> 8. After a partial late payment was offered by [Bellsouth], the balance due to [Singing River] by [Bellsouth] as of August 1, 2010 for the 2008 year is $958,033.46;
> 9. That [Singing River] has rebutted the presumption, and the differential did not occur equally from the 1999 pole count until the 2008 pole count;
> 10. That the reduction in poles occurred in 2008, as evidenced and verified by the 2008 pole count of 45,010 poles;
> 11. That a pole, once attached, remains a Joint Use Pole until written notification concerning the abandonment of the pole is given to the Owners of the pole. Otherwise, space is reserved and the pole continues as a Joint Use Pole with reserved space in the future.

(Compl. at 9-10). Bellsouth's arguments in support of its Motion to Dismiss, only pertain to the construction of Article XI (F). The Motion to Dismiss does not address Singing River's requests for a declaratory judgment that a pole becomes a joint use pole once space is reserved on the pole by the other party, and that a pole remains a joint use pole until the owner of the pole is provided notice that the attachments have been removed. In fact, the Motion does not even argue or demonstrate that all of the requests hinge on an interpretation of Article XI(F). As a result, Bellsouth has not demonstrated that the declaratory judgment claim should be dismissed in its entirety. Nevertheless, since the issue of the proper interpretation of Article XI (F) is a question of law that has been fully briefed by the parties and it appears that resolution of this issue would substantially advance this litigation, the Court will construe Article XI(F) at this time.

The parties agree that Mississippi law should apply in this case. Issues

concerning contract interpretation are questions of law. *Parkerson v. Smith*, 817 So. 2d 529, 532 (¶7) (Miss. 2002); *Massengill v. Guardian Mgmt. Co.*, 19 F.3d 196, 201 (5th Cir. 1994). The Mississippi Supreme Court has explained: "The primary purpose of all contract construction principles and methods is to determine the intent of the contracting parties." *Facilities, Inc. v. Rogers-Usry Chevrolet, Inc.*, 908 So. 2d 107, 110 (¶6) (Miss. 2005) (quoting *Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc.*, 857 So. 2d 748, 752 (¶9) (Miss. 2003). When interpreting a contract, a court must first look to the four corners of the contract itself and give effect to all of its clauses. *Facilities, Inc.*, 908 So. 2d at 111(¶10). The court's concern is "not nearly so much with what the parties may have intended, but with what they said, since the words employed are by far the best resource for ascertaining the intent and assigning meaning with fairness and accuracy." *Id.* Therefore, it would be improper for a court "to infer intent contrary to that emanating from the text at issue." *Id.* The court can only look beyond the contract's language if it determines that the contract is ambiguous. *Id.* "[T]he mere fact that the parties disagree about the meaning of a contract does not make the contract ambiguous as a matter of law." *Id.* (quoting *Turner v. Terry*, 799 So. 2d 25, 32 (Miss. 2001)).

In the present lawsuit, neither party argues that the contract is ambiguous, but they disagree over the meaning of the word *presume* as it was used in the Agreement. Black's Law Dictionary defines the word *presume* as "[t]o assume beforehand; to suppose to be true in the absence of proof." Black's Law Dictionary (9th ed. 2009).

Both parties have referred to the Merriam-Webster definition of *presume*:

    1: to undertake without leave or clear justification: dare

    2: to expect or assume especially with confidence

    3: to suppose to be true without proof <presumed innocent until proved guilty>

    4: to take for granted: imply. . . .

Merriam-Webster, http:// www.merriam-webster.com/dictionary/presume (last visited Jan. 27, 2011). Synonyms for the word *presume* include *assume*, *speculate*, *suppose*, *surmise*, and *suspect*. *Id.*

The parties primarily disagree over whether the presumption created by the Agreement is conclusive or rebuttable. Black's Law Dictionary defines *conclusive presumption* as "[a] presumption that cannot be overcome by any additional evidence or argument." Black's Law Dictionary (9th ed. 2009). The Dictionary cites as an example the conclusive presumption that a child under the age of seven is incapable of committing a felony. *Id.* It also cites evidence textbooks that note that conclusive presumptions are "usually mere fictions" that are in essence substantive rules of law. *Id.* (quoting Richard Eggleston, Evidence, Proof and Probability 92 (1978); John H. Wigmore, A Students' Textbook of the Law of Evidence 454 (1935)). The Dictionary defines *rebuttable presumption* as "[a]n inference drawn from certain facts that establish a prima facie case, which may be overcome by the introduction of contrary evidence." *Id.*

Singing River argues that the phrase *presumed innocent until proven guilty*

should influence this Court's interpretation of the Agreement. It notes that everyone would be conclusively presumed innocent of every crime if Bellsouth's proposed definition of *presumed* were accepted. However, it is important to note that the phrase includes the words *until proven guilty*, which adds the ability to rebut the presumption. In the present case, the Agreement does not include the word *until* or the word *unless*. The Agreement also does not in any way indicate that the presumption can be rebutted.

The Court finds that the language that follows the parties' use of the word *presume* demonstrates that the presumption was intended to be conclusive rather than rebuttable. The Agreement provides:

> If any difference in the number of Joint Use Poles is found between the actual physical inventory and the previous inventory adjusted by any applications approved or attachments removed since the last inventory, the differential will be presumed to have occurred equally over the time since the last inventory **and prorated equally over that time**. That differential **shall be billed** at the appropriate rate for each of the **prorated years** . . . .

(*Id.* at Art. XI (F)) (emphasis added). Thus, the Agreement specifically states that the differential *will be prorated equally* and *shall be billed at the appropriate rate for each of the prorated years. See id.* The Agreement leaves no room for either party to rebut the presumption that the differential occurred equally. Had the parties intended to reserve the right to rebut this presumption they could have simply included such language in the agreement. It would be improper for this Court "to infer intent contrary to that emanating from the text at issue." *See Facilities, Inc.*, 908 So. 2d at

111(¶10).  Therefore, the Court finds that the presumption that the differential would be prorated equally is conclusive.

Nevertheless, as explained previously, Bellsouth did not demonstrate that Singing River's declaratory judgment claim should be dismissed in its entirety, and the Court cannot determine from the undeveloped record before it which requests for a declaration may be mooted by this Court's interpretation of Article XI(F).  Therefore, Bellsouth's Motion to Dismiss the declaratory judgment claim is denied in part. Bellsouth also seeks dismissal of Singing River's unjust enrichment, specific performance, attorneys' fees, and punitive damages claims.  Thus, the Court will now address those claims.

**II.  Singing River's Unjust Enrichment Claim:**

In support of its unjust enrichment claim, Singing River asserts that it provided utility poles to Bellsouth pursuant to the Agreement, and it incurred costs to carry out those contractual obligations.  Singing River further argues that Bellsouth never notified Singing River that it had removed any attachments prior to the 2008 inventory.  Singing River asks this Court to find that Bellsouth is contractually obligated to pay pole rental fees on all poles on which attachments were made or upon which space was reserved, and to hold that Bellsouth owes Singing River $958,033.46 for the use of the poles.  Therefore, Singing River's unjust enrichment claim is based solely on the contractual obligations of the parties.

The doctrine of unjust enrichment "applies to situations where there is no legal contract but where the person sought to be charged is in possession of . . . property

which in good conscience and justice he should not retain but should deliver to another . . . ." *Joel v. Joel*, 43 So. 3d 424, 432 (¶27) (Miss. 2010). Because an Agreement existed between Singing River and Bellsouth and Singing River is seeking relief pursuant to that Agreement, it has not stated a claim for unjust enrichment.

### III. Singing River's Request for Specific Performance:

Bellsouth argues that Singing River has failed to state a claim for specific performance, because it seeks relief that is not provided for in the contract. It is axiomatic that the existence of a valid and enforceable contract is a requirement for a valid claim for specific performance. *See* 25 Williston on Contracts §67:2 (4th ed. 2010).

> Singing River asks the Court to require Bellsouth to:
>
> 1. Submit to and participate in an immediate system-wide safety inspection throughout [Singing River's] system;
> 2. Submit to and participate in an immediate pole count of all lines and Attachments by [Bellsouth] on the poles of Singing River;
> 3. Identify any and all areas of noncompliance by [Bellsouth] with any contractual obligation, to verify and ensure that all applicable contractual obligations, Federal and State laws, codes, or other applicable rules are being fully complied with by Bellsouth;
> 4. [Comply] with all applicable codes, law, rules and regulations as required by law, so long as [Bellsouth] remains on [Singing River] Attachments;
> 5. Require [Bellsouth] to fully and completely comply with Article III (C) by providing height, class, and loading information of all Attachments by [Bellsouth] on any joint use pole from January 1, 2003 forward; and
> 6. Require the Parties to develop a timetable to allow [Bellsouth] to remove itself from [Singing River] poles, or negotiate a new Contract.

(Compl. at 15).

Singing River has terminated the Agreement with Bellsouth, but Article XXIV

of the Agreement provides that the Agreement will remain in full force and effect following termination to the extent that attachments remain on joint use poles so that the parties can control the rights and obligations of the parties with respect to those remaining attachments. The Agreement does not require removal of attachments after termination.

The Court finds that the Agreement does not require safety inspections, and inventories are only required every five years, with the last occurring in 2008. Therefore, Singing River's first two requests for specific performance cannot be granted. However, its third, fourth, and fifth requests are arguably provided for by Article III of the Agreement. As for the sixth request, the Court has not located a provision in the Agreement that permits one party to require another party to remove its attachments from joint use poles. Once again, the Agreement provides that termination of the Agreement does not require the parties to remove existing attachments. Finally, the Court cannot require the parties to enter into or negotiate a contract. *See Wiggins v. Perry*, 989 So. 2d 419, 429 (¶22) (Miss. Ct. App. 2008) ("A court, as a matter of law, cannot fashion such a remedy because the formation of a contract requires mutual assent, often referred to as a 'meeting of the minds.'"). Therefore, request number six does not state a claim upon which relief can be granted. As a result, the Motion to Dismiss Singing River's specific performance claim is granted in part and denied in part.

**IV. Singing River's Claim for Punitive Damages and Attorneys' Fees:**

"Punitive damages may not be awarded if the claimant does not prove by clear

and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud." Miss. Code Ann. § 11-1-65. Singing River argues that Bellsouth has failed to comply with the National Electric Safety Code and federal and state law, particularly with regard to safety issues. It also refers to the dispute over the interpretation of Article XI (F). The Court finds that Singing River has not alleged facts arising to the level of malice, gross negligence, or wilful, wanton, or reckless disregard. At this point, it has alleged nothing more than a contract dispute. Therefore, it has failed to state a claim for punitive damages. Moreover, "[a]bsent statutory authority or contractual provisions, attorneys' fees cannot be awarded unless punitive damages are also proper." *Warren v. Derivaux*, 996 So. 2d 729, 739 (¶32) (Miss. 2009). Therefore, the claim for attorneys' fees must also be dismissed.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the Motion to Dismiss [4] filed by Bellsouth Telecommunications, Inc., is **GRANTED** as to the unjust enrichment claim, the punitive damages claim, the attorneys' fees, and as to certain portions of the specific performance and declaratory judgment claims. The Motion is **DENIED** in all other respects.

**SO ORDERED AND ADJUDGED** this the 1st day of February, 2011.

s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
CHIEF U.S. DISTRICT JUDGE